Tony CALVO and Capital Real Estate, a corporation, Appellants,

v.

Kenneth CALHOON, Appellee.

No. 2839.

Supreme Court of Alaska.

Jan. 31, 1977.

Anne Marie Falvey, Johnson, Christenson, Shamberg & Link, Inc., Anchorage, for appellants.

Albert Maffei, Maffei, Inc., Anchorage, for appellee.

## OPINION

Before BOOCHEVER, C. J., and RABINOWITZ, CONNOR and BURKE, JJ.

RABINOWITZ, Justice.

Kenneth Calhoon instituted this litigation in 1974 when he brought suit against his former employer, Tony Calvo, a real estate broker, to obtain payment of a commission he allegedly earned while in the employ of Calvo. The commission sought represented one-half of the brokerage commission received by Capital Real Estate on an out-of-house sale of property concerning which Calhoon had obtained the original exclusive listing. The case was tried to the district court without a jury and the court entered judgment for the amount claimed. Calvo then appealed to the superior court. After reviewing the record and briefs, the superior court affirmed the district court's judgment and this appeal followed.[1]

Two primary issues have emerged in this appeal. First, we must decide whether the district court correctly determined that Calhoon was entitled to a commission for the listing in question. Secondly, if Calhoon was entitled to a commission, we must further decide whether the district court was correct in its ruling as to the amount of such commission.

The record shows that Calhoon was employed as a real estate salesperson by Calvo of Capital Real Estate in February or March of 1973. There was no written contract of employment and at trial the focus of the parties' disagreement centered on what was the agreed commission for out-of-house (co-brokerage) transactions. The parties' witnesses agreed that when both the listing and the sale were accomplished by employees of Capital (an in-house transaction), the listing salesperson would receive 20% of the commission, the salesperson 50%, and the brokerage the remaining 30%. In circumstances when the listing salesperson was also the selling salesperson, then a total commission of 70% would be earned by that individual. In regard to out-of-house or co-brokerage transactions, Calhoon and his witnesses testified that the agreed commission was 50% of the commission paid to Capital whether that employee sold or listed the property. On the other hand, Calvo and his witnesses testified that in a co-brokerage transaction the Capital employee would be paid 20% of the amount received by Capital if the employee had listed the property, or 50% if the employee had sold the property. The district court found that the oral agreement between Calhoon and Calvo was that the former was to

1. Appellee Calhoon did not file a brief on appeal to this court. Appellate Rule 11(b)(10) provides in part, "When the brief is not filed as required, appellee will not be heard on the argument except on consent of his adversary, or by request of the court."

receive 50% of the commission paid to Calvo, in regard to out-of-house transactions, whether Calhoon sold or listed the property.

Regarding the factual circumstances which form the basis for Calhoon's claim for compensation, the record shows the following. After a significant expenditure of effort, Calhoon obtained a listing on the Bayshore Apartments which were owned by Mr. and Mrs. Robert Phillips.[2] That exclusive listing was to expire as of June 5, 1973. During the greater part of the life of this first listing, Calhoon made no effort to sell the property because Calvo told him he desired to purchase the property for himself.[3] Approximately two weeks before the June 5, 1973, expiration date, Calvo advised Calhoon that he did not intend to purchase the subject property. Although the testimony is somewhat contradictory as to when an extension of the listing was obtained, an extension until June 20, 1973 was obtained by Calhoon on the Phillips property. Thereafter, another extension of the listing running until August 20, 1973, was obtained.[4]

The Phillips property was eventually sold through a co-brokerage arrangement, executed on July 18, 1973, to Investment Brokers. The closing took place on October 3, 1973. Prior to the actual closing Calhoon left the employ of Calvo and Capital Real Estate. The parties' versions of Calhoon's separation differed markedly. Calvo testified that he had heard Calhoon was spending in excess of half of each working day working at another real estate brokerage office. Calhoon admitted that he was attending training programs at the other realty firm and that he intended to transfer there. Although Calvo testified that he knew that Calhoon had a desire to transfer to a larger firm, he felt "betrayed" by Calhoon's actions.[5]

Calhoon presented a different picture of the circumstances surrounding his termination and transfer. According to Calhoon's testimony, Calvo knew that he was disenchanted and as a result Calvo had told him to "look around." Calhoon further stated that when he left Capital "there were no ill feelings whatsoever."

In support of his contention that Calhoon is not entitled to compensation, Calvo argues that since Calhoon did not procure the listing under which the Phillips property was sold, he is not entitled to any commission and, since Calhoon was not in the employ of Calvo when the final negotiations for the sale of the Phillips property were completed, Calhoon did not earn any commission.

■ The Alaska statutory system governing real estate brokers and salespersons implies that the relationship is one of employer and employee. AS 08.88.171(c) states that a person must be "employed by a real estate broker" in order to be licensed as a "real estate salesman." AS 08.88.331 further provides that "[a] real estate salesman or associate real estate broker may make a real estate transaction only through the real estate broker who employs him." Thus, the resolution of various issues in this

---

2. The property covered by the listing consisted of 2½ lots, a ten-plex and a private dwelling located on L Street in Anchorage.

3. Calhoon further testified that Calvo told him during this period that, "You've earned your listing commission and, you know, thank you very much. Consider it sold."

4. Calhoon testified that he and Calvo called Phillips over to the realty office to obtain this extension. He stated:

> Tony Calvo and I were sitting right across the desk from [Phillips] and we said—and prior to that Tony said, 'Be sure and, you know, let me handle this.' At the time I'd—

only been in the business for about two or three months, and so we're sitting across from Bob Phillips and Tony said, 'We do have an offer to present, however, I do need your initials on an extension,' and he slid the piece of paper—the listing contract over across at Mr. Phillips, and Mr. Phillips at the time renewed it again for the next sixty days.

Phillips testified that Calvo obtained the final extension, but that Calhoon had introduced him to Calvo for that last meeting.

5. Calvo further testified that Calhoon left the office "bag and baggage" on July 18, 1973. Calvo signed the transfer of Calhoon's license to Dynamic Realty on July 21, 1973.

case are governed by principles of employer/employee relations rather than by the special rules applicable only to brokers attempting to recover commissions from sellers.[6]

In deciding whether Calhoon is entitled to recover any compensation under his oral contract of employment with Calvo, we think Section 448 of the Restatement (Second) of Agency (1957) is determinative.[7] This section provides:

An agent whose compensation is conditional upon his accomplishment of a specified result is entitled to the agreed compensation if, and only if, he is the effective cause of accomplishing the result.[8]

District Judge Brewer, in his conclusions of law, ruled in part that:

[I]t does indeed appear that the Plaintiff [Calhoon] had substantially performed his terms of contract, at least in this one transaction, and was certain in his own mind that he had secured the listing and had brought the parties together in the first instance. Had the license of Plaintiff been transferred to his new firm he associated with on July 18th, Plaintiff would not be on quite as substantial ground in proving his claim as he is, but even so, he would have substantially performed.

As indicated at the outset, the case at bar concerns an exclusive listing agreement which was renewed several times. It is not disputed that the final extension under which the property was sold was technically obtained by Calvo. However, the weight of the evidence demonstrates that it was Calhoon who was the "effective cause" in obtaining the extension of the listing. Phillips himself testified that in regard to the granting of the listing and the subsequent extensions, he was dealing with Calhoon "exclusively." [9] More particularly, the record shows that Phillips testified as follows:

Question: . . . Did Calhoon, was he instrumental in any way in getting you to meet with Calvo when you had the verbal . . . agreement on the extension of the listing?

Answer: Yes, I went over there and he introduced me to Calvo in the office . . . I didn't even know him up to that time. . . .

Question: Yeah.

Answer: All my dealings had been with Calhoon, and that is why I listed the property. It was because I liked him. . . . There had been many people, real estate brokers wanting to list that property, but Calhoon impressed me favorably and that is why I listed it with him.[10]

In light of the above, we are of the view that there exists a strong evidentiary basis for the district court's conclusion that in essence Calhoon's efforts were the effective cause in obtaining the last listing extension from Phillips.[11] We think there are sound

---

**6.** This approach has been used in most jurisdictions. *See, e. g., Wilcox v. Reis,* 146 Cal. App.2d 513, 303 P.2d 774 (1956); *Brad Wolff & Associates, Inc. v. Perrin,* 470 P.2d 887 (Colo. App.1970); *De Benedictis v. Gerechoff,* 134 N.J.Super. 238, 339 A.2d 225 (1975); *Sorenson v. Brice Realty Co.,* 204 Or. 223, 282 P.2d 1057 (1955).

**7.** Oral contracts of employment between brokers and salespersons have been upheld even in states which, like Alaska, require the listing agreement to be in writing. *See Sorenson v. Brice Realty Co.,* 204 Or. 223, 282 P.2d 1057 (1955).

**8.** Comment *a* to this section provides that:
An agent is an 'effective cause,' as that phrase is used in this Section, when his ef-

forts have been sufficiently important in achieving a result for the accomplishment of which the principal has promised to pay him, so that it is just that the principal should pay the promised compensation to him.

**9.** Calvo lodged no objections at trial to the introduction of Phillips' testimony which was taken by deposition.

**10.** Calhoon testified that he was present at the time Phillips granted the last listing extension, but that Calvo decided to handle the matter himself.

**11.** Inherent in our analysis is the conclusion that the district court's treatment of the issue parallels that embodied in Section 448, Restatement (Second) of Agency (1957).

policy reasons for permitting Calhoon to recover a listing commission on the sale of the Phillips property, even though Calvo participated in the mechanics of procuring Phillips' signature on the extension of the original exclusive listing agreement.[12] Since the real estate office is under the control of the broker, it is conceivable that the broker could take over all listings which required an extension of time. Such a result seems very unfair, particularly where, as here, part of the reason that an extension was required can be attributed to Calvo's initial intention to purchase the property and subsequent change of plans. Similarly, there are sound reasons not to deny Calhoon his listing commission even if he terminated before the negotiations had ended.[13] As observed by the court in *Hofer v. Polly Little Realtors, Inc.*, 543 P.2d 114, 116 (Colo.App.1975), the denial of a commission on that basis would

. . . lead to the patently unjust result that salesmen employed on a commission basis could be terminated with impunity prior to a closing and thus deprived of large commissions obtained for their employers as a result of their efforts.[14]

■ Calvo next advances the argument that the district court's finding that Calhoon was entitled to a commission of 50% of the commission earned by Calvo and Capital Real Estate, in the setting of an out-of-house sale, was clearly erroneous. As we have noted previously, the testimony on this issue was in sharp conflict. Calvo and two other witnesses testified that in this situation the listing salesperson would receive only 20% of the brokerage's commission; Calhoon and his two witnesses testified that the listing salesperson would receive 50%. It was pointed out in cross-examination that in a transaction such as the Phillips sale, in which the two brokerage houses divided the commission equally, a 50% listing commission would equal 25% of the entire commission. It was thus claimed that it would be illogical to compensate the listing salesperson more when the sale was effected out-of-house than when the entire transaction occurred in-house. On the other hand, it was pointed out that if the Calvo contention was adopted the brokerage house would profit by an out-of-house sale.[15] Other evidence which could have influenced the district court was testimony that Calhoon had previously been the listing salesperson in a co-brokerage transaction at Capital and was paid a 50% commission. Calvo admitted that Calhoon was paid 50% of Capital's share, and explained that the reason 50% had been paid was that there were special circumstances surrounding that particular transaction. Calhoon denied that there were special circumstances.

In light of our review of the entire record, we are persuaded that the district court's findings regarding the agreed upon listing commission for an out-of-house sale were not clearly erroneous. Resolution of

12. *See* note 4 *supra*.

13. The trial court did not specifically find when Calhoon was terminated, but found that his license was not transferred until July 21, 1973, after the sellers had accepted the co-brokerage offer on July 19, 1973.

14. Calvo argues that this court's decision in *Diggins v. Johnson*, 513 P.2d 660 (Alaska 1973), precludes a claim in quantum meruit in this case. *Diggins* involved a suit between a broker and a seller for a commission. The broker had obtained an exclusive listing from the seller which expired prior to the time that he produced a "ready, willing and able" buyer. The court held that to allow an award in quantum meruit would "undermine the purpose of the statute of frauds." 513 P.2d at 664. Thus, it is clear from the holding in *Diggins* that if an extension of the listing had not been obtained, Capital would not have been entitled to a commission. While that is relevant on the issue of whether Calhoon had earned a commission, it is not determinative of the question of whether we would recognize a quasi-contractual claim by a salesperson once the commission had been earned by the brokerage company. Further, the holding in the *Diggins* case rested on the statute of frauds; that is not a problem in the case at bar.

15. On an in-house sale Capital receives 30% of the commission. On a 50% co-brokerage transaction, if the listing salesperson is paid 20% of the house's share (10% of the total commission), the house would receive 40% of the entire commission.

evidentiary conflicts are within the trial court's province and here there is ample evidence to support the particular findings in question.

Calvo's next specification of error deals with the district court's resolution of his contention that the termination of Calhoon for cause cut off any right to compensation which became due after the breach of loyalty. Calvo's arguments are based on the asserted principle that discharge of an employee for cause bars any claim to compensation which might become due after the termination.

■ Corbin states that when an employee is discharged for good cause:

> The employee can maintain suit for [the] agreed amount of wages, in spite of his subsequent wilful breach; and he does not need to resort to quantum meruit. The effect of his subsequent breach is then restricted to the remaining and incomplete part of his contract, this part not itself having an apportioned equivalent. If the contract as a whole is held not to be divisible by apportionment of the parties themselves, the fact that the employer justly discharges the employee does not make it divisible.[16]

Here the contract of employment is clearly divisible and Calhoon had completed performance with respect to the listing of the Phillips property. If any compensation became due after the sale was ultimately closed, it had been earned long before the date of termination. The mere fact that the sale was consummated after Calhoon was terminated does not in and of itself mandate that Calhoon was not entitled to compensation.[17]

■ Calvo appears to be contending that an application of the principle of agency which precludes an agent from recovering compensation for conduct which constitutes a breach of the duty of loyalty[18] would deny Calhoon's recovery in this case. That rule is applicable only when the agent breaches the duty in the transaction for which he seeks compensation, if the contract of employment is divisible. Thus, the following questions become pertinent, namely, was Calhoon's conduct a breach of the duty of loyalty; and, if so, does such breach bar compensation for the Phillips sale.

■ The district court determined that there had been no breach of the duty of loyalty because Dynamic Realty, Calhoon's new employer, did not benefit from the sale of the Phillips property. Calvo argues that his position was not based only on pirating clients and, thus, that the district court "failed utterly to deal with the question." There is merit in this contention. However, Section 393 of the Restatement (Second) of Agency provides that:

> Unless otherwise agreed, an agent is subject to a duty not to compete with the principal concerning the subject matter of his agency.

The reasons for this rule are clear. The agent should serve only one master with respect to the subject matter of the agency.[19] Thus, if the contract was not divisible and therefore the subject matter of Calhoon's agency was the listing and sale of real estate, it would be clear that Calhoon breached the duty of loyalty, unless his dealings with Dynamic were with Calvo's consent or involved only a pre-employ-

---

16. 5A A. Corbin, Corbin on Contracts § 1128, at 34–35 (1964).

17. *See J & B Motors, Inc. v. Margolis*, 75 Ariz. 392, 257 P.2d 588, 592 (1953); *Hofer v. Polly Little Realtors, Inc.*, 543 P.2d 114, 116 (Colo. App.1975); *De Benedictis v. Gerechoff*, 134 N.J.Super. 238, 339 A.2d 225, 229 (1975).

18. Restatement (Second) of Agency § 469 (1957) provides:

> An agent is entitled to no compensation for conduct which is disobedient or which is a breach of his duty of loyalty; if such conduct constitutes a wilful and deliberate breach of his contract of service, he is not entitled to compensation even for properly performed services for which no compensation is apportioned.

19. *See Bockemuhl v. Jordan*, 270 Wis. 14, 70 N.W.2d 26, 29 (1955).

ment training program.[20]  However, nothing was ever introduced at trial which tended to show that Calhoon was involved with listing or selling at Dynamic prior to the time his license was transferred.  More specifically, it was never contended at trial that Calhoon competed with Calvo with respect to this specific transaction.  Thus, we conclude that any alleged breach of the duty of loyalty would not bar Calhoon's claim for compensation in this case.

The final specification of error deals with the admission into evidence of a purported offer of compromise made by Calvo which was admitted for the purpose of impeaching Calvo's credibility.  In cross-examination, after Calvo had denied that he owed Calhoon any money, he was asked:

> Do you remember anytime you may have considered the fact that you may have owed him some money?

After answering "yes," Calvo was asked to examine Exhibit 5, which is a check signed by Calvo on the Capital account in the amount of $1,537 payable to Calhoon for "Listing Fee Phillips/Sparks."  The word "Partial" is written in above "Listing Fee."  The check was never admitted into evi-

dence; however, counsel for Calhoon, over objection, was allowed to cross-examine Calvo extensively about the check.  The court allowed reference to the check only for impeachment purposes.  From the questioning, it was clear that Calvo had tendered the check to Calhoon in settlement of the claim.[21]

Alaska Civil Rule 43(i)(2) provides:

> An offer of compromise is not an admission and no evidence thereof shall be permitted.

The policy underlying this rule is based on the desire by the law to encourage settlement over litigation.[22]

Assuming arguendo that the use of the check for impeachment purposes was improper, in light of our review of the entire record in this case, we conclude that any references to the check constituted harmless error.[23]  Here the district court judge was well aware of the fact that an offer of compromise cannot be taken as an admission of liability.  In this case, which was tried to the court without a jury, Calvo has failed to demonstrate that he was prejudiced by the questioning concerning the check.[24]

---

**20.**  Calhoon testified that he was transferring with Calvo's consent.  Calvo testified that on the day of termination Calhoon said he had been attending training programs.

**21.**  The following interchange took place during the cross-examination of Calvo:

> Q: . . . but the payment was—It was still tendered, was it not?
> A: In good faith, yes, sir.
> Q: Alright, and you now say that you do not owe him anything?
> A: I said I don't owe him anything then, too, sir.
> Q: But you're still paying him?
> A: Apparently not.  He hasn't accepted the offer.

**22.**  *See Redman v. Dep't of Education,* 519 P.2d 760, 768 (Alaska 1974).  *See also Allstate Ins. Co. v. Winnemore,* 413 F.2d 858, 863 n. 10 (5th Cir. 1969).

Wigmore draws the distinction between an offer to pay or settle which is made prior to and one made after a controversy has arisen between the parties.  4 J. Wigmore, Evidence § 1061 n. 1, at 33 (Chadbourn rev. 1972).  *See*

*Reese v. McVittie,* 119 Colo. 29, 200 P.2d 390 (1948), where in litigation to recover compensation for services rendered as a real estate broker, the defendant's offer to pay plaintiff a certain amount before the controversy arose was admitted into evidence.

According to Wigmore, "[t]he true reason for excluding an offer of compromise is that it *does not* ordinarily proceed from and *imply a specific belief that the adversary's claim is well founded,* but rather a belief that further prosecution of that claim, whether well founded or not, would in any event cause such annoyance as is preferably avoided by the payment of the sum offered." (emphasis in original).  4 J. Wigmore, Evidence § 1061, at 36 (Chadbourn rev. 1972).

**23.**  *See Martinez v. Bullock,* 535 P.2d 1200, 1206 (Alaska 1975); *Love v. State,* 457 P.2d 622, 632 (Alaska 1969).

**24.**  In *Zerbinos v. Lewis,* 394 P.2d 886, 890 (Alaska 1964), it was held that the burden is on appellant to show prejudice as well as error.

The superior court's affirmance of the district court's judgment in the case at bar is Affirmed.

ERWIN, J., not participating.