[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff, William R. Lawler, a licensed real estate salesman, who became associated in 1993 with the franchised real estate agency owned by the defendant, Philip M. Blazawski, a licensed real estate broker, has brought this action to recover commissions that he claims are due and payable under a written settlement agreement that he alleges was made between the parties on September 30, 1994, the date that he received written notice from the defendant of his termination. The defendant alleges that the document relied upon by the plaintiff was obtained from him while he was under duress and that it did not therefore supersede the provisions concerning the payment of the plaintiff's share of the defendant broker's commissions under the original so-called "Broker and Salesperson Agreement" (Agreement) which was signed by the parties on January 25, 1994, and was stipulated by counsel to be the contractual document that governed the relationship between the parties in terms of their respective rights and obligations.
The theory of liability relied upon by the plaintiff in the first count of his complaint is that the defendant breached the "settlement agreement" which Blazawski claims to have signed under duress, and he seeks to recover under the second count on the alternative theory of unjust enrichment. In the last count of his complaint, as amended, he asserts a claim for punitive damages and attorney's fees on the ground that the actions and conduct of the defendant, prior to his termination and thereafter, constituted a violation of CUTPA, and he alleges in support of his claimed cause of action under that statute, that Blazawski "engaged in trade or commerce by contracting with the plaintiff to provide services to him, and/or by listing and selling property to the general public . . .", and although Blazawski admits in his answer that he "engages in trade or commerce as to the general public [he denies that] the defendant engaged in trade or commerce with the plaintiff within the CT Page 1652 meaning of [CUTPA]."
The defendant's special defenses relate to Lawler's actions and conduct during the two day period before September 30, 1994, the date of his formal termination by means of a written notice given to him as required by the Agreement, and includes the claim stated in the first special defense, which is not disputed, that on the evening of September 28, 1994, after a heated argument that morning between the parties, Lawler discovered when he returned to his office that all of his files had been removed from his desk, and then proceeded to remove about half of the agency's "records of active real estate listings, pending transactions and sales." The second special defense alleges that during that same period, the plaintiff, "through an agent in the defendant's office, made threats to do bodily harm and injury to the defendant and to do damage to [his] property and [that he] signed the [settlement] document under such threats through coercion and under duress [so that] the document is null and void and of no effect as a contract between the parties."
The first of the five counts of the defendant's counterclaim sounds in conversion, based on the plaintiff's "theft" of the broker's files and his refusal to return them until the "settlement agreement" had been signed, and the three counts that follow claim that Lawler, in his subsequent attempts to enforce the terms of the purported settlement agreement violated certain regulations of the real estate commission governing the conduct of brokers and salespersons, as well as the express provisions of the original Agreement concerning unsold listings and the division of commissions on sales after the termination of their association. The fifth count alleges that the plaintiff's conduct constituted a CUTPA violation despite the fact that the defendant's answer to the plaintiff's CUTPA claim states that although the broker "engages in trade or commerce as to the general public [the parties were not] engaged in trade or commerce [with each other] within the meaning of [CUTPA]".
After the plaintiff had rested, and the defendant had moved to dismiss all of the counts of the complaint except for the first count based on breach of contract, the plaintiff renewed the claim that he had made at the outset of the trial that Lawler was an independent contractor, based principally on paragraph 7 of the Agreement which states that "[t]he relationship of the Salesperson to the Broker is that of an independent contractor, and the Salesperson shall not be treated as an employee [of] the CT Page 1653 Broker for Federal Tax purposes or for any other purpose." In response to the court's specific question as to whether the essential "trade or commerce" component of a CUTPA claim could be established where the dispute relates to the termination of the relationship of a broker and his salesperson, counsel stated the plaintiff was providing services to the broker for compensation and that they were both engaged in the trade or commerce of selling real estate, although he acknowledged that no claims were being made that any third parties, including other salespeople in the office or the clients of the agency, had suffered injury or harm of any kind as a result of any of the acts or conduct alleged by the parties against each other in their pleadings.
On the first day of the trial, before any evidence had been presented, and despite the fact that the issue of Lawler's legal status for the purpose of establishing liability under CUTPA was a disputed question of law that had been raised by both parties in their pleadings, plaintiff's counsel stated that they were prepared to stipulate that Lawler was an independent contractor as stated in the standard broker and salesperson agreement that they had signed on January 25, 1994, but the court rejected counsel's offer to agree as to a matter of law without any evidentiary basis for such a "stipulation". In the course of the trial, Thomas Welles, a local real estate broker and owner of the real estate agency that Lawler joined immediately after his termination, testified that although the contractual designation of a salesperson as an independent contractor was required under General Statutes § 20-312b to insulate real estate brokers from liability under the Workers' Compensation Act, it was his personal opinion and "the consensus in the profession [that the] salespeople are more akin to self-employed people."
Welles also offered testimony, based on his personal experience as a real estate broker for more than twenty-five years, about the nature and extent of the broker's right to control the means and methods of the work of his sales agents, which is considered to be the most important test of whether a salesperson is an independent contractor or an employee, and was expressly incorporated into paragraph 7 of the Agreement as a contractual condition of their relationship, despite the fact that § 20-312b does not mandate the inclusion of such a provision in the written contract that is required under the statute in order to protect the broker from liability for workers' compensation. In that connection it should be noted that the second sentence of the same paragraph, as noted earlier in CT Page 1654 this opinion, states that the salesperson's status is that of an independent contractor for all purposes, but omits the significant qualification in subsection (1) of the statute that the salesperson is given that status "for purposes of workers' compensation" only.
The first sentence of paragraph 7 states that the broker "shall have the right to determine the services which the Salesperson shall perform but shall not have the right to dictate [to] the Salesperson as to the manner in which the services are to be performed." Section 9 of the Agreement deals with termination and provides that "[t]his agreement may be terminated by either party at any time upon prior written notice given to the other [and that the broker] will attempt to make an agreement with the terminated agent upon the [agent's] leaving the Company."
The testimony given by Welles on the issue of the broker's right to control the means and methods of his sales force in response to the questions on that subject by the court and counsel was that "[w]hen pushed to the mat, a broker will back off or terminate the individual [and that he had] been pushed to the mat." Upon further questioning as to those two choices he stated that if the broker "doesn't like the way his agent is representing his company and he feels that the agent is marching in a different direction than the company and the agent doesn't want to conform, then he has no other choice but to [terminate] that agent."
The testimony of the parties themselves as to the precipitating cause for Blazawski's decision to terminate Lawler's affiliation with his agency is of particular significance on the issue of whether the defendant had the "right to dictate . . . the manner in which the [plaintiff's] services were to be performed" within the meaning of the Agreement. The plaintiff's brief asserts, and it is essentially undisputed, that the "final straw" was the argument between the parties on the morning of September 28, 1994, "involving Blazawski's disclosure of a letter to a potential buyer in a situation in which Lawler believed it was his decision how the information contained in the letter should be presented to the prospective buyer."
Blazawski testified that after the plaintiff refused to give him the letter at that time, he told Lawler that he had "to play ball according to the rules and if you can't do that, you can't CT Page 1655 work here", whereupon, according to the defendant's testimony, Lawler announced that he was quitting, and it was the defendant's understanding that he had thereby terminated his association with the agency. Earlier in his testimony, Blazawski had stated that "[o]n Wednesday, the 28th, at about 11 a.m. [Lawler] was asked for a letter which he said was confidential. He would not give it to me. I said, `Bill, I am the broker, and you work for me. You have to cooperate with me . . .'".
 I
"The determination of the status of an individual as an independent contractor or employee is often difficult [but] in the absence of controlling considerations, is a question of fact [citation omitted]"; Robert C. Buell Co. v. Danaher,127 Conn. 606, 610 (1941); and it involves "a consideration of the total employment situation and the economic realities of the work relationship rather than from formalistic labels, subjective intent, or a good-faith belief that an employer-employee relationship does not exist." Bonnette v. California Health Welfare Agency, 525 F. Sup. 128, 135 (N.D. Cal. 1981). The "economic realities" of the work relationship between a real estate broker and his sales staff were recently explored and determined by the trial court in an action brought under General Statutes § 31-72 by the labor commissioner against a real estate agency to recover commissions on behalf of two of its former salespeople, and after an appeal had been taken by the broker from the court's conclusion that they were employees, our Supreme Court reaffirmed its prior decision in Latimer v.Administrator, 216 Conn. 237, 251 (1990), that an employment relationship could be found to exist even in the face of a signed agreement that the parties were independent contractors, and despite an admission by one of the claimants in her trial testimony that she did not consider herself to be an employee.Tianti v. William Raveis Real Estate Inc., 231 Conn. 690, 694-95
(1995).
Prior to the statutory exclusion from the Unemployment Compensation Act of "[s]ervice performed by an individual . . . as a real estate salesperson [who is compensated] solely by way of commission . . .," which is now codified as General Statutes § 31-222(a)(5), our Supreme Court held that securities salesmen were the employees of the brokerage business for which they worked, where the practical realities of the relationship between them were remarkably similar to the actual relationship CT Page 1656 between the parties under the facts and circumstances of this case. Robert C. Buell , Co. v. Danaher, supra, 127 Conn. 606. The Court held that the trial judge could reasonably conclude that the salesmen were working in the brokers' business which depended on the method and manner in which the salesmen were doing their work, that it had the right to control their conduct and the power to enforce that right by holding over them the threat of discharge if they did not do their work to the satisfaction of the brokerage firm. Id. 612.
The case law that defines the term "independent contractor" in the workers' compensation context is also of particular significance because, as has already been noted, General Statutes § 20-312b(1) requires that the broker-salesperson agreement include the provision that "[t]he broker or salesman, for purposes of workers' compensation, is engaged as an independent contractor associated with the person for whom services are performed . . ." Generally stated, the common law definition is that "[t]he independent contractor contracts to produce a given result by methods under his own control [while the] employee contracts to produce a given result, subject to the lawful orders and control of his employer in the means and methods used in that employment [and that he] is bound in some degree to the duty of service to the employer." Aisenberg v. Adams Co., Inc.,95 Conn. 419, 421 (1920).
The test of the employment relationship is not whether there is in fact actual interference with the work that is being done, because it is "the right to interfere, that makes the difference between an independent contractor and [an employee]." Caraher v.Sears, Roebuck Co., 124 Conn. 409, 413 (1938). The fact that payment is made solely by way of commission rather than salary or wages and that the person doing the selling "could regulate his own hours of work is without significance [because his] pay depended upon the result of his sales [and the] particular hours he worked were unimportant to the employer, provided adequate sales were made." Aisenberg v. Adams Co., Inc., supra,95 Conn. 423.
When the performance of the services contracted for are unsatisfactory for any reason and the employer is "at liberty at any time to discharge the [salesperson] from its employment [such] right of discharge is one of the strong indications that the relation is one of employment [because an] independent contractor must be permitted to finish his contract in the CT Page 1657 absence of breach on his part." Id. The term "independent contractor" presupposes the existence of a binding contract between the parties, for the breach of which a cause of action arises, and the most important factor in determining whether a person is an employee is the right of either party to terminate the relationship without liability. Northeast Insurance Co. v.Soucy, 693 A.2d 1141, 1144 (Me. 1997).
The restrictions imposed upon real estate agents under Connecticut statutes and regulations must also be considered in determining whether their status is that of an employee of their broker, such as the statutory definition that a licensed real estate salesperson must be affiliated with, or employed by, a real estate broker; General Statutes § 20-311(2); and that when that person becomes associated with a different broker his or her license must be transferred to the new broker. General Statutes § 20-319a. Other restrictions were referred to by Welles in the course of his testimony, including the fact that a licensed real estate agent can receive commissions only through the broker with whom he is affiliated, that unsold listings remain the property of the broker, and that the salesperson has no authority independent of the broker with whom he is affiliated to utilize essential information sources such as the multiple listing services, whose membership consists exclusively of, and is limited to, licensed real estate brokers.
Courts in other jurisdictions have held that similar statutory provisions governing real estate brokers and salespersons imply that the relationship is one of employer and employee and that the resolution of the issues raised in an action brought by a real estate agent against his former broker for the payment of commissions earned during his association with that broker "are governed by principles of employer/employee relations rather than by the special rules applicable to brokers attempting to recover commissions from sellers." Calvo v.Calhoon, 559 P.2d 111, 113-14 (Alaska, 1977); Phillips v. JCMDevelopment Corp. , 666 P.2d 876, 881 (Utah 1983); see also Hughesv. Industrial Commission, 551 P.2d 962 (Ariz.App. 1976). A similar argument could be made in this case, based on the statutory and regulatory restrictions on the activities of real estate salespersons in Connecticut, that the relationship between them and the broker with whom they are associated is that of "employer" and "employee", that they are not "independent contractors" in the legal sense, and that if they are unable to successfully negotiate their differences concerning the sharing CT Page 1658 of commissions as contemplated under the Agreement, the only legal recourse available to a salesperson who has been terminated would be to bring a statutory wage recovery action such as the one that was brought by the plaintiffs in Tianti v. WilliamRaveis Real Estate, Inc., supra, 231 Conn. 690.
The court need not consider that argument, however, or follow the approach taken by other state courts in the above-cited cases, because the evidence in this case, and more specifically, the testimony of Welles and Blazawski concerning the practical and economic realities of the relationship between brokers and their sales agents in general, and between the parties to this action in particular, compels the conclusion that, to paraphrase an early landmark workers' compensation opinion, although "[t]he contract is adroitly framed to suggest a different relation [if the salesperson] does anything at variance with the will of his employer, its policy or preference, he knows that his contract of employment may be ended overnight." Glielmi v. Netherland DairyCo., 171 N.E. 906, 907 (N.Y. 1930). Similarly, the undisputed trial testimony of the two brokers involved in this case clearly establishes that although under ordinary circumstances sales agents appear to go about their work independently of the broker as stated in the Agreement, if a salesperson such as the plaintiff "does anything at variance with the will of [the broker or his] policy or preference," he is subject to discharge, but despite the fact that after he has been terminated pursuant to the Agreement he is not an employee for the purposes of determining his statutory entitlement to workers' compensation or unemployment compensation benefits, the court finds that under the facts and circumstances of this case, at least, Lawler was an employee for all other purposes at the time of his termination, including the possible liability of either of the parties to the other under CUTPA, and that thereafter, it was the broker's duty under the Agreement to "attempt to make an agreement with the terminated agent" concerning his compensation.
The employer-employee relationship does not fall within the definition of trade or commerce for the purposes of a CUTPA action; Quimby v. Kimberly Clark Corp. , 28 Conn. App. 660, 670
(1992); and although employees may be actively engaged in promoting trade or commerce, the actual employment relationship is not itself "trade or commerce" within the meaning of CUTPABanerjee v. Robert, 641 F. Sup. 1093, 1108 (D. Conn. 1986), citingManning v. Zuckerman, 444 N.E.2d 1262 (Mass. 1983) (construing a similar Massachusetts statute). The holding of the Appellate CT Page 1659 Court in Quimby was cited with approval by the Supreme Court when it affirmed a trial court's determination that the plaintiff's claim "involved an employer-employee relationship and did not rise to the level of trade or commerce cognizable under CUTPA."United Components, Inc. v. Wdowiak, 239 Conn. 259, 264 (1996).
The plaintiff has attempted to state a cause of action under CUTPA without reference to his status as either an employee or an independent contractor, based on the broad statutory definition of "trade" and "commerce" in § 42-110a(4), which includes "the advertising, the sale . . . the offering for sale . . . or the distribution of any services and any property . . .," and alleges that the defendant "engaged in trade or commerce by contracting with the plaintiff to provide services to him, and/or by listing and selling property to the general public . . .". It has been held, however, that "the services contemplated by this definition are those offered generally by a person for sale to the public in a business transaction, not those services sold by an employee to an employer within the same organization." Manningv. Zuckerman, supra, 444 N.E.2d 1265.
Although a real estate broker, of course, engages in trade and commerce under the statutory definition of those terms, "the hiring and firing of employees is not part of [his] commercial activities with regard to consumers, competitors, or other business persons." Id. The court's conclusion that the claims of the parties in this case are based upon the employment relationship that existed between them, establishes that they are not engaged in trade or commerce with each other, and accordingly, disputes between the parties to that relationship are not covered by the statutory remedies that would otherwise be available to persons engaged in commercial transactions because such disputes are private in nature and do not occur "in the conduct of trade or commerce" within the meaning of statutory prohibitions of unfair trade practices, and do not constitute the kind of "unscrupulous behavior in the market place" that such legislation was intended to deter for the benefit of the general public. Id. 1266.
There have been two Connecticut trial court decisions in which claims of liability under CUTPA in actions brought by real estate agents against brokers for the payment of commissions have been rejected based on the holding in Tianti v. William RaveisReal Estate, Inc., supra, 231 Conn. 696, that a real estate salesperson in an employee within the meaning of General Statutes CT Page 1660 § 31-72 for the purpose of bringing an action under that statute to recover commissions from a real estate broker. In the first case, the plaintiff had alleged in her CUTPA count that she was an independent contractor rather than an employee, but the court nevertheless granted the defendant broker's motion to strike based on Tianti; Stewart v. William Raveis Real Estate,Inc., Superior Court, judicial district of New Haven at New Haven, Docket No. CV 95-0371850 (August 7, 1995) (1 Conn. Ops. 958); and in the second case, a motion for summary judgment was granted because "Connecticut statutory and decisional law indicate that [the plaintiff] was, as a matter of law, an employee of the defendant firm and therefore ineligible for CUTPA claims." Stratton v. Preferred Properties, Superior Court, judicial district of Stamford-Norwalk at Stamford, Docket No. CV 94-01425895 (November 7, 1995) (15 Conn. L. Rptr. 393, 395).
The plaintiff has argued that the allegedly wrongful actions and conduct of the defendant which are the basis for his claims against him of unfair trade practices, namely, Blazawski's failure to pay commissions under the substituted agreement or to transfer the listings and contracts to Welles, his new broker, took place after the termination of his employment and are therefore not barred because they did not arise out of the employment relationship. This argument, however, has been rejected by the Massachusetts Appeals Court which stated in a recent opinion construing Manning v. Zuckerman, supra,444 N.E.2d 1262, that "Manning held simply that any claim arising from the employment relationship was not actionable under [that state's Unfair Trade Practices Act and] it imposed no limitation that the employment relationship be ongoing . . ."; Informix, Inc. v.Rennell, 668 N.E.2d 1351, 1353-54 (Mass.App. 1996); and a Connecticut trial court has held that CUTPA is not applicable to post-termination claims for sales commissions because they were all earned during the salesman's employment and therefore "[t]he dispute upon which the plaintiff bases his CUTPA claim arises solely out of the employment relationship. " Sall v. Jones ApparelGroup Inc., Superior Court, judicial district of Norwalk-Stamford at Stamford, Docket No. CV 92-0125013 (May 12, 1993) (9 CONN. L. RPTR. 90-91).
The court therefore concludes for all of the foregoing reasons that neither party has a viable claim against the other under CUTPA, and finds the issues in favor of the defendant against the plaintiff on the eighth count of the complaint, and finds the issues in favor of the plaintiff against the defendant CT Page 1661 on the fifth count of his counterclaim.
 II
The sequence of events that preceded a meeting between the parties at the ERA Philips agency's office in Coventry on Friday, September 30, 1994, which the plaintiff claims culminated in a binding agreement concerning Lawler's commissions, are essentially undisputed and may be summarized as follows. On Thursday morning, immediately after the defendant learned that his business files were missing, he called Lieutenant Doughty of the Coventry police department and filed a formal complaint against the plaintiff. After Doughty called him back and told him that Lawler wanted to have a meeting to discuss the situation, Blazawski retained a local attorney, Richard Cromie, to represent him in order to recover the files, and thereafter, on Friday afternoon, the defendant, accompanied by his wife, Elizabeth Blazawski, the police officer, and Cromie, met for over three hours with Lawler, who was not represented by an attorney at that time.
The issue of duress, as has already been noted, is raised in the defendant's second special defense, in which he alleges that threats of "bodily harm and injury" were communicated to him through an agent in the defendant's office, but although that person was identified as a witness that Blazawski would call, she did not testify despite the fact that the plaintiff had testified that he never made any such threats directly or indirectly through anyone in the office. Cromie also testified that no physical threats of any kind were made by Lawler during their discussions, and accordingly the court finds that no credible non-hearsay evidence has been presented that supports that particular aspect of the defendant's claim of duress.
Although Cromie stated that the defendant was emotional, excitable and upset during the meeting and was "obsessed" with the importance of getting his files back, he felt that his client was capable of making a rational decision at that time as to whether or not to sign the final version of the document which included certain changes and deletions that had been suggested by both of them. Cromie also testified that he did not pressure Blazawski into agreeing to it, and that after the document had been signed by both parties, even though the words "under duress" had been written under his client's signature, it was his assumption that both parties would comply with its terms in order CT Page 1662 to resolve their differences.
Blazawski himself acknowledged that he was capable of making a rational decision about signing the document and that he did so at the direction of his wife, Elizabeth Blazawski, who advised him to "get it over with" and instructed him to put the words "under duress" below his signature during a private discussion that they had out of the presence of the others. When he was questioned as to whether he had been pressured into signing it by his attorney, he stated that "[t]he pressure that was put on me was put on me by my wife to sign it," and she also testified that he had done so only at her insistence.
The fact that a party to an agreement testifies that he was intimidated and fearful at the time that it was made is not sufficient in and of itself to establish the defense of duress because if his testimony were given that effect almost any contract could be avoided. Hastain v. Greenbaum, 470 P.2d 741,746 (Kan. 1970). Moreover, where the party who raises that defense is an experienced businessman who is represented by counsel and signs an agreement settling a claim by the other party for services rendered merely as a matter of prudent business judgment, he has "simply made no showing [that] the compromise and settlement agreement resulted from anything other than the exercise of his own free will." Id. 748.
In the absence of threats of actual bodily harm, there can be no duress where the contracting party is free to consult with counsel. Carrier v. William Penn Broadcasting Co., 233 A.2d 519,521 (Pa. 1967). This rule is applied in order "to avoid the invalidation of otherwise binding contracts where they have been entered into with the advice of counsel or where a party is free to consult with counsel." Degenhardt v. Dillon Co.,669 A.2d 946, 951 (Pa. 1996).
Where a party insists upon a contractual provision or a payment which he honestly believes he is entitled to receive, certainly unless that belief is without any reasonable basis, his conduct is not wrongful and does not constitute duress or coercion under Connecticut law; Weiner v. Minor, 124 Conn. 92, 95
(1938); Zebedeo v. Martin E. Segal Co., 582 F. Sup. 1394, 1417 (D. Conn. 1984); and the fact that consent was given, or payment was made, under protest or "under duress" as in this case, does not establish duress. Smedley Co. v. Lansing, 35 Conn. Sup. 578
(1978). Even in those jurisdictions that have expanded the CT Page 1663 stricter common law definition of duress to include economic or financial compulsion, it is not sufficient to show that consent was secured by the pressure of financial circumstances, or by the fact that one party insisted upon a legal right and the other party yielded to that insistence, and actionable economic duress will not be found to have been proved unless there was no reasonable alternative to the terms presented by the party whose conduct is claimed to have been coercive. 25 Am.Jur.2d, Duress and Undue Influence § 7.
Entirely apart from any of the foregoing essential elements of proof of the defense of duress under Connecticut case law or under the more liberal doctrine of economic or financial compulsion, the threshold requirement of causation must be established, namely, that "the consent given must be the result of the coercion exerted [by the other party and that] the consent was actually induced by the pressure applied and would not have been given otherwise." Morrill v. Amoskeag Savings Bank,9 A.2d 519, 525 (N.H. 1939). A settlement agreement will not be invalidated when the duress emanates from third persons who have no involvement with the party seeking to enforce it; King v.Bishop, 879 S.W.2d 222, 224 (Tex.App. 1994); and because the evidence offered by the defendant himself in this case establishes that the decisive coercive influence exerted upon him to sign the agreement came from his wife at a time when he was also being pressured by the other agents in the office to do so, rather than from the defendant, the rejection of the defense of duress can be justified on that ground alone. See Matter ofMarriage of Banks, 887 S.W.2d 160, 164 (Tex.App. 1994).
Accordingly, the court, as already noted, concludes that the defendant has not offered any admissible evidence of threats of "bodily harm and injury" to the defendant as alleged in his second special defense, and also finds that his defense of duress has not been proved because he was represented by counsel throughout the meeting and both he and his attorney actively participated in the drafting of the agreement. Moreover, he signed the document only at his wife's insistence and at the time he did so, he apparently believed that the document was "meaningless" and unenforceable despite the fact that the attorney representing him at the time believed that there had been a meeting of the minds in accordance with the defendant's contractual duty to at least attempt to make an agreement with the defendant as a "terminated agent" under the terms of the original Agreement between the parties. CT Page 1664
For the foregoing reasons, the court finds that the defendant breached the supplemental agreement concerning commissions which was entered into on September 30, 1994, by withholding commissions that were lawfully due him, and the only remaining issue is the extent to which the plaintiff has proved the damages that he seeks under the first count of his complaint.
 III
The supplemental agreement between the parties which is the basis of the plaintiff's damage claims provided that he would receive commissions on transactions that were nearing completion and that some existing listings and contracts of sale which were being negotiated would become the property of Lawler's new broker. It also stated that the defendant agreed to pay commissions to the plaintiff that he would otherwise be entitled to had he not been terminated, and that any fees that would have been chargeable against those commissions "shall be handled from the broker's side of, the commission."
In the accounting that the defendant sent to the plaintiff on October 5, 1994, as required under state regulations, Blazawski asserted that although he had signed the agreement under duress and he considered it to be invalid in all respects, he nevertheless agreed to pay him commissions for his "listings and sales currently under contract." He also stated that he would not comply with the provision that the broker assume responsibility for the fees because "I do not work for you for free", and that "[a]ll commissions which you may be due will be held in escrow until this matter is resolved."
It is undisputed that seven of the fifteen listings which were the subject of the negotiations between the parties had been bindered before the plaintiff's termination and resulted in closings and the receipt by the defendant of his broker's commission shortly thereafter, and that based on the contractual provisions that fees would be assumed by the broker, the calculation of the plaintiff's share of the commissions on those closings results in a total amount due the plaintiff of $8,974.00. All of the deeds that conveyed the title of those properties to the purchasers were marked as exhibits without objection and Lawler also testified about the nature and extent of the work that he performed in connection with each of the transactions that were ultimately consummated. CT Page 1665
A salesperson who seeks to recover commissions from his former broker "that had been bindered before [he] left the defendant's employ, but that had closed after [he] had left [has] the burden to prove, by a preponderance of the evidence, that the defendant owed [him the commissions on those transactions]."Tianti v. William Raveis Real Estate, Inc., supra, 231 Conn. 701. The court finds that the plaintiff has satisfied his burden of proof with respect to the seven properties that were sold after the termination of his employment with the defendant, and that his calculations of the total amount of the commissions due were properly based on the provisions of the supplemental agreement.
The plaintiff's claim with respect to the remaining properties that were not sold is based on the theory that had the listings been transferred to his new broker, Welles, as contemplated in the agreement, he would have earned additional commissions, and that as a result of the defendant's breach of the provisions for the transfer of listings and contracts to his new employer he is entitled to damages for "lost profits". Apart from the speculative and conjectural nature of the plaintiff's claim, the original contractual provision that "[u]nsold listings become the property of the company" could not be superseded by an agreement to which Lawler's new broker was not a party, and, as a practical matter according to Welles, such transfers of listings or contracts could only be negotiated between the brokers themselves.
In this connection, it should also be noted that the court has already determined that Lawler was an employee rather than an independent contractor for all purposes relevant to the issues in this case which includes, of course, the question of damages. Accordingly, "the resolution of [all the] issues in this case are governed by principles of employer/employee relations rather than by the special rules applicable only to brokers" as independent contractors. Calvo v. Calhoon, supra, 559 P.2d 113-14.
Accordingly, the court finds that the plaintiff has satisfied his burden of proof as to damages only with respect to the seven properties that were sold after the termination of his employment and that he is therefore entitled to damages of $8,974.00.
The plaintiff also seeks to recover prejudgment interest under General Statutes § 37-3a from the defendant for the wrongful detention of the commissions that he had earned after CT Page 1666 they became payable.
The allowance of interest as an element of damages is primarily an equitable determination that must be made by the trial court based on whether the interests of justice require the allowance of interest as damages for the loss of the use of money, and the real question in each case is whether the party against whom interest in sought has wrongfully detained money due the other party. Bertozzi v. McCarthy, 164 Conn. 463, 466-67
(1973). Because an allowance of statutory prejudgment interest turns on whether the detention of the money is or is not wrongful under the circumstances, it is a factbound determination which lies within the discretion of the trial court after it has heard the evidence, and its familiarity with the facts makes it best able to decide whether an award of interest is appropriate based on the equitable considerations that apply under the particular circumstances of that case. Spearhead Construction Corp. v.Bianco, 39 Conn. App. 122, 134-35 (1995).
Whether or not interest will be recognized as a proper element of damages should "be made in view of the demands of justice rather than through the application of any arbitrary rule." Bernhard v. Rochester German Ins. Co., 79 Conn. 388, 398
(1906). The purpose of the statute is to compensate the prevailing party for the delay in obtaining the money that rightfully belongs to him; Neiditz v. Morton S. Fine Associates, Inc., 199 Conn. 683, 691 (1986); and an award of interest may be made even where there is a legitimate dispute about the interpretation of a contract, or its existence, for that matter, as was claimed in this case. See Harris CalorificCo. v. Manifold Systems, Inc., 18 Conn. App. 559, 566 (1989).
In assessing the wrongfulness of the withholding by the defendant of the plaintiff's commissions after they had become due and payable under the applicable provisions of both agreements, the court has taken into consideration the reasonable inference that can be drawn that the defendant did not make a good faith attempt to resolve their differences as he, as the broker, was required to do under the Agreement, but instead led Lawler, the police officer, and even his own attorney, to reasonably believe that the "mediation" had been successful despite the fact that he clearly had no intention at the time of complying with any of its terms. The court also finds it to be of some significance that the defendant himself candidly admitted in the course of his testimony that if not for his premature and CT Page 1667 precipitous action in taking the plaintiff's files before either party had given written notice to the other of his decision to terminate the employment relationship as required under the Agreement, Lawler "probably" would not have retaliated by taking the defendant's files, thereby setting in motion a chain of events which eliminated any possibility that their differences could be successfully resolved by any means other than litigation.
For the foregoing reasons, the plaintiff is allowed prejudgment interest pursuant to § 37-3a from March, 1995 in the amount of $2,093.00 in addition to his contract damages of $8,974.00.
Accordingly, judgment may enter in favor of the plaintiff the first count of his complaint for $11,067.00, and in favor of the plaintiff against the defendant on his counterclaim.
Harry Hammer Judge Trial Referee